AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

_____ DISTRICT OF  MASSACHUSETTS _____

UNITED STATES OF AMERICA

V.

ROMEO DISTASIO DOB 9/16/62
16 Parker Drive
North Reading, MA

**CRIMINAL COMPLAINT**

CASE NUMBER: 04M-1078-JGD

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about ___February 1, 99 to May 4, 04___ in ___Suffolk___ county, in the _____ District of ___Massachusetts___ defendant(s) did, (Track Statutory Language of Offense)

being a Postal Service employee, converted to his own use, money coming into his hands or under his control, in the execution or under color of his office, employment, or service; or failed to account for, or failed to remit such money to the Treasury of the United States or other designated depository.

in violation of Title ___18___ United States Code, Section(s) ___1711___.

I further state that I am a(n) ___Postal Inspector___ and that this complaint is based on the following
                                    Official Title
facts:

See attached affidavit

Continued on the attached sheet and made a part hereof:   ☒ Yes    ☐ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

04-06-2004                                                  at           Boston, MA
Date                                                                     City and State

JUDITH G. DEIN
U.S. MAGISTRATE JUDGE                              _____
Name & Title of Judicial Officer                        Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.



## AFFIDAVIT OF MICHAEL J. GENDRON

I, Michael J. Gendron, being duly sworn, do hereby depose and state:

1. I am a Postal Inspector assigned to the Boston Division of the United States Postal Inspection Service and have been so employed since September of 1989. Since 1993, I have been assigned to investigate financial losses to the United States Postal Service ("Postal Service"), including theft of postal funds by employees. I have conducted numerous investigations throughout the states of Massachusetts, Maine, New Hampshire, and Vermont which have resulted in the identification and prosecution of individuals for theft of postal funds and services. I have taught courses and instructed other Postal Inspectors throughout the United States regarding methods and techniques used to investigate financial losses to the Postal Service. I have assisted in the development and instruction of training courses designed to teach other Postal Inspectors how to identify and investigate embezzlements. One such training course dealt directly with examining documents and postal financial records generated by Integrated Retail Terminals ("IRT") to identify theft by postal employees.

2. This affidavit is being submitted for the limited purpose of supporting a criminal complaint and does not include each and every fact known to me concerning this investigation. This affidavit is submitted in support of a criminal complaint charging Romeo F. DiStasio, DOB: 09/16/62

1

("DiStasio"), with misappropriation of postal funds, in violation of Title 18, United Stated Code, Section 1711.

3. Based on my training and experience, I am aware it is a violation of Title 18, United Stated Code, Section 1711 for any postal employee to fail to account for money or property coming into his hands or under his control, in the execution or under color of his employment, in a manner not authorized by law. Based upon my investigation, and as detailed below, I have probable cause to believe that between February 1, 1999, and May 4, 2001, Romeo Distasio embezzled approximately $22,440 in postal funds which were entrusted to him.

4. In May 2001, I was assigned to investigate a report of financial irregularities at Fort Point Station, a post office located at 25 Dorchester Avenue in Boston, MA. The events that give rise to these charges were brought to light when Postal Sales Clerk Verlene Howard ("Clerk Howard") reported that someone had altered her PS Form 1412 ("Daily Financial Report") on May 4, 2001, after it had been submitted by her. Under the procedures in place at the Fort Point Station in May of 2001, nobody was authorized to make such alterations without the permission of the postal clerk whose report was being changed. Clerk Howard reported that the changes made to her Daily Financial Report reduced the amount of her reported postage sales on May 4, 2001, by $1,000 and reduced the amount of cash remitted by the same amount. Clerk Howard reported that she kept a copy of her Daily Financial Report dated May 4, 2001, and discovered discrepancies when she compared it to

2

the Daily Report on file at the post office. According to Clerk Howard, and as confirmed by my own investigation, the Daily Financial Report on file is not the report that she submitted at the end of her shift on May 4, 2001.

**SUMMARY**

5. Based on Clerk Howard's report, I initiated an investigation which included, among other things, retrieving and reviewing Postal records and conducting witness interviews. My investigation revealed that between January 1, 1999, and May 4, 2001, there were 49 instances of unauthorized adjustments made to clerks' Daily Financial Reports which reduced the amount of cash remittance (see Exhibit 1). My investigation also revealed that in order to make these adjustments, the perpetrator would have had to have known the clerk's computer password (discussed below). Of these 49 instances, the only two clerks whose records were altered were Clerk Howard and Clerk Halley: 7 separate adjustments to Clerk Hally's reports and 42 adjustments to Clerk Howard's reports. The investigation revealed that the only person who knew the passwords of both of these two clerks was DiStasio. In 47 of the 49 instances, the investigation established that these adjustments were made after the clerk had left work for the day. In addition, in these 47 instances, the adjustments were made during Romeo Distasio's work hours. In the other two instances, July 7 and July 15, 1999, the computer generated time stamp on the records suggest that the adjustments were made at times during Clerk Howard's work hours and prior to

3

DiStasio's arrival. However, I have retrieved postal records which demonstrate that on both occasions, Clerk Howard could not have finalized her report at the time printed on the Daily Financial Report. Specifically, on July 15, 1999, although the print time listed on Howard's Final Daily Financial Report is 2:04 p.m., the postal service has a copy of a transaction receipt that indicates that Clerk Howard sold a phone card to a customer at 3:36 p.m. On July 7, 1999, although the computer generated time stamp lists a print time of 2:30 p.m., the postal service has a copy of a credit card receipt which indicates that Clerk Howard conducted a transaction at 3:45 p.m. This evidence suggests that on these two dates somebody adjusted the internal clock on a postal computer to mask the actual time at which the adjustments were made.

**DISCOVERY OF THE ALTERATIONS**

6. Although there were 49 instances of such adjustments, this scheme was not uncovered until May 4, 2001. Clerk Howard made her discovery when she noticed that her stamp accountability balance had been altered. In general, Clerk Howard's stamp accountability balance was between $120,000 and $250,000. Thus, unless Howard had reason to remember the exact amount of her stamp accountability balance, she likely would not have noticed (and in fact did not notice prior to May 4) a small discrepancy. As stated above, she noticed the discrepancy on May 4, 2001, because she had reason to remember the exact amount of her previous day's balance.

7. During this time period, Postal window clerks were

4

assigned a quantity of postage stamps of various types and denominations. Postal employees were responsible for the full value of this supply of stamp stock, which varied from day to day. This stamp supply was referred to as stamp accountability. Also included in this stamp accountability was approximately $100 in cash which each clerk was permitted to keep on hand for the purpose of making change, as well as whatever money the clerk had on hand in the form of coins. When postage sales were reported and funds were remitted, the amount of stamp stock the employee was responsible for was reduced. This amount was increased when the post office distributed additional stamp stock to the clerk. The stamp stock, or stamp accountability balance, assigned to a window clerk at Fort Point Station could vary from as little as $5,000 to as much as $250,000. During the period that these unauthorized adjustments were made, Clerk Howard's stock ranged from approximately $120,000 to $250,000. From 1999 to 2001, Postal regulations required that a clerk's stamp stock be inventoried and compared to his/her accountability balance every 120 days. However, because of the poor accounting procedures in place at that time, the inventories never uncovered any shortages in either Clerk Howard's or Clerk Halley's accountability balance which were significant enough to attract any suspicion.

8. During an interview with Clerk Howard, she explained to me how it was that she came to notice a discrepancy in her Daily Financial Report. Howard explained that she typically

5

does not keep copies of her Daily Financial Reports, but on May 4, 2001, she did in fact keep a copy. She explained that she was running late in preparing her Daily Financial Report and remittance because she was having a problem with her IRT disk. Clerk Howard explained that because of the difficulty she was having with her disk on May 4, she had to re-initialize her disk, which caused her to have to re-enter some of her figures for the day. In re-initializing her disk, one of the numbers she had to re-enter was her accountability balance. Thus, when she returned to work two days later on May 6, she had reason to remember her stamp accountability balance. When she opened her disk at the beginning of her shift, she noticed that her stamp accountability balance had been changed from the total she had calculated on May 4, 2001. She was then able to confirm the discrepancy because she had kept a copy of her Daily Financial Report from May 4. When she compared the accountability figure on her disk to the one on her May 4, 2001, Daily Financial Report, she discovered that someone had, without her authorization or knowledge, reduced the amount of her stamp sales and cash remittance, which had the effect of increasing her stamp accountability balance by the same amount.

**WINDOW CLERKS**

9. Window Clerks are the postal sales clerks who handle over-the-counter sales transactions in the customer service section of the post office. Back in 2001, sales clerks at the Fort Point Station of the Boston, MA, Post Office used

Integrated Retail Terminals ("IRT's") to record financial transactions with postal customers. An IRT is essentially a computerized cash register. For each sales transaction, the window clerk would input the type and amount of the transaction (e.g., postage sales, money order sales, post office box rental fees, etc.) into their IRT. The IRT recorded each transaction and maintained cumulative running totals for each type of sales transaction. As this information was inputed by the clerk, it was simultaneously recorded and saved onto the clerk's floppy disk. Each clerk was required to insert their disk into their IRT at the beginning of their shift and then retrieve it at the end of their shift.

**DAILY FINANCIAL REPORT** (see for example Exhibit 2)

10. At the end of a shift, each window clerk was required to account for their day's transactions. They did this by preparing a Daily Financial Report, called a PS-1412, which was essentially a daily accounting sheet. Clerks prepared their report by using the information stored on their floppy disk. Included on the clerk's Final Daily Financial Report were the total sales for the day, as well as the amount of money (cash, checks, etc.) the clerk was remitting for deposit into the postal bank account.

**FLOPPY DISKS**

11. Once a sales clerk printed a final Daily Financial Report, it effectively locked the information stored on the floppy disk. Before leaving for the day, each clerk was

7

required to turn in their floppy disk along with the paperwork and remittance. These items were submitted to consolidation clerks (discussed below), who reviewed the window clerks' reports and remittance to ensure that all of the day's receipts were accurately accounted for.

**PASSWORD**

12. Each window clerk's floppy disk was protected by a password. Each clerk's password was confidential and was supposed to be only known by the individual clerk. This password protected the information stored on the floppy disk, thus preventing others from gaining access and making changes without a window clerk's authorization.

**ERROR CORRECT FEATURE**

13. In the event that a window clerk made a mistake in entering a transaction, an error correct feature on the computer allowed them to make corrections. This error correct feature could also be used at the end of the day when window clerks prepared their Daily Financial Reports. Any time the error correct feature was used to <u>reduce</u> a figure on their report, the IRT would automatically record these corrections and then log them onto a computer generated list. This list, referred to as a Clerk Adjustment List (see for example Exhibits 3), was automatically printed when a window clerk printed their final Daily Financial Report, and the window clerk was required to turn the list in to the consolidation clerk along with the Daily Financial Report. Because the Clerk Adjustment List was computer generated, changes could

8

not be made to the list itself; changes could only be made to the Daily Financial Report, and those changes would then be reflected on the Clerk Adjustment List. Thus, any time a reduction was made to a clerk's Daily Financial Report, it was reflected on the corresponding Clerk Adjustment List. In addition, the Clerk Adjustment List recorded the time (in military time) at which a change was made (see left side of Clerk Adjustment List).

**CONSOLIDATION CLERKS**

14. Consolidation clerks were responsible for the daily accounting of all walk-in customer transactions at the Fort Point Station. Consolidation clerks did this by gathering all of the Final Daily Financial Reports and cash receipts from all of the window clerks and consolidating them into one Unit Final PS-1412 ("Unit Daily Financial Report"), which is a final aggregate accounting of the days transactions for the whole unit. On each day, the Unit Daily Financial Report would reflect the transactions conducted by all window clerks whose shifts <u>ended</u> on that particular day. Consolidation clerks prepared the Unit Daily Financial Report through use of a control disk which allowed them to consolidate information from all of the window clerks' floppy disks onto one program. The control disk <u>did not</u>, however, allow the consolidation clerks to make changes to the information contained on the individual window clerk's floppy disks. The control disk merely acted as a mechanism to retrieve the information contained on a window clerk's floppy disk.

9

15. To begin the consolidation process, the control disk was inserted into an IRT, which then allowed the consolidation clerk access to a consolidation menu on the computer. The control disk was then removed and a window clerk's floppy disk inserted. The information from the window clerk's disk was then copied to the computer. The window clerk's disk was then removed and the control disk re-inserted so that the information from the window clerk's disk could be copied onto the control disk. This process was repeated for each window clerk's floppy disk. Thus, after each of the floppy disks had been copied, the control disk contained all of the information for the day's business at that post office. Once a window clerk's disk went through this process, all of the totals representing funds received that day reverted back to zero. This purging process essentially erased that day's financial report from the disk once it was consolidated. For this reason, the original Daily Financial Reports which had been altered are not available for retrieval. The only computerized financial information carried forward to the next business day was the window clerk's stamp accountability balance. Then, with all of the information copied onto the control disk, the consolidation clerk could consolidate all of the numbers to form one Unit daily Financial Report. After preparing the Unit Daily Financial Report, the consolidation clerk was responsible for depositing the day's remittance into the postal bank account.

**ALTERING A CLERK'S FINAL DAILY REPORT**

16. Once a window clerk printed a Final Daily Financial Report, and thereby locked the disk, the only way to access and make changes to a window clerk's Daily Financial Report was to use the control disk in conjunction with the window clerk's password. This could be done by inserting the control disk and accessing a menu which listed an option to open a clerk's disk. Once this menu was accessed, the control disk would be removed and the window clerk's floppy disk would be inserted. The window clerk's disk could then be accessed if the window clerk's private password was used. Once the window clerk's disk was opened with the <u>control disk and password</u>, changes could then be made to the figures reported on the disk. This procedure, assuming the confidentiality of each window clerk's password, ensured that changes were not made without the knowledge of the individual window clerk.

17. In the normal course, if a consolidation clerk noticed a mistake or discrepancy on an individual window clerk's Daily Financial Report after the clerk had left for the day, the consolidation clerk would typically make a note of it on the Unit Daily Financial Report and then have the window clerk simply adjust his/her accountability balance the next work day to reflect the accurate numbers. The only way for a consolidation clerk to adjust a window clerk's accountability balance would be if he/she knew the window clerk's password. These passwords, however, were supposed

11

to be only known to the individual window clerks.

18. In April and May of 2001, there were two consolidation clerks at Fort Point Station because of the extended business hours there. Consolidation Clerk Irene McClanahan's scheduled work hours were from 9:30 a.m. to 6:00 p.m. (Prior to January 2000, Clerk McClanahan's scheduled work hours were 7:30 a.m. to 4 p.m.). DiStasio performed the duties of consolidation clerk at Fort Point Station later in the day. His scheduled work hours were 8 p.m. to 12:30 a.m. (DiStasio's scheduled work hours prior to January 2000 were 4 p.m. to 12:30 a.m.). In general, Irene McClanahan did the consolidating for the window clerks whose Final Daily Financial Reports were ready prior to her ending time. Once McClanahan finished her consolidation, she would leave the control disk for Distasio to use in completing the day's consolidation. On occasion, McClanahan would not be able to consolidate all of the earlier window clerks' Daily Financial Reports and remittance before the end of her shift. In such circumstances, McClanahan would instruct those window clerks to leave their Daily Financial Reports and remittances for DiStasio to consolidate and deposit. In order to get their reports and funds to Distasio, window clerks would do one of two things: (1) if Distasio began work prior to the window clerk leaving for the day, the window clerk could simply hand her reports and funds directly to Distasio; or, (2) if the window clerk was leaving prior to Distasio's arrival,

12

the window clerk would place her report and funds into a sealed envelope, place a registered mail number onto the envelope, and then place it into a registered mail cabinet so it could be retrieved later by DiStasio. After completing his consolidation, DiStasio would take his deposits, as well as any deposits left by Irene McClanahan, and make a deposit to the postal bank account.

19. When window clerks left their funds and reports for Distasio, they would record the registered mail number on a daily log sheet (see for example Exhibit 4). When Distasio then retrieved the envelope, he was responsible for initializing the log sheet to indicate that he had taken custody of the reports and corresponding funds. By reviewing these daily logs, I was able to determine that on five of the six dates of unauthorized changes between January 26, 2001, and May 4, 2001, Distasio in fact retrieved (and consolidated) the Daily Financial Reports and remittance from the registered mail cabinet. Prior to January of 2001, Distasio worked an earlier shift. In most of the other 43 instances, Distasio's work hours overlapped with those of Clerk Howard and Clerk Halley, and therefore Howard and Halley would have simply handed their paperwork and remittances directly to Distasio.

20. As part of the consolidation process, the consolidation clerks prepared a handwritten log ("remittance log") (see for example Exhibit 5), which listed the funds remitted by each window clerk. This log was used to total

13