the funds remitted to the postal bank account. At the end of his shift, DiStasio was responsible for placing all paperwork, including each window clerk's Final Daily Financial Reports and Adjustment List, the Unit Daily Financial Report, and related paperwork in an envelope to support the day's business at the Fort Point Station. Also included among these items was the consolidation clerks's handwritten log. These paper records were maintained by the Postal Service.

21. Based upon Clerk Howard's initial complaint, I compared her copy of her Daily Financial Report for May 4, 2001, with the Daily Financial Report on file for the same date. I noted that Clerk Howard's copy was printed at 4:40 p.m. (the print time is generated by the computer and is listed on the report) and her reported postage sales totaled $6,123.09, with a remittance of $6,070 in cash. The Daily Financial Report on file with the Unit Daily Financial Report listed $5,123.10 in postage sales and a remittance of $5,070. I also noted that next to the remittance total the initials "IM," purportedly reflecting verification by Consolidation Clerk Irene McClanahan, were handwritten in. In looking at the Clerk Adjustment List on file for Clerk Howard, I noticed that her reported postage sales were reduced by $1,000. Clerk Howard's own copy of her Adjustment List does not list a $1,000 reduction. The computer generated time stamp on both the Daily Financial Report and Clerk Adjustment List on file for Clerk Howard

14

indicated that they were printed at 10:17 p.m., long after Clerk Howard had left for the day. On May 4, 2001, Clerk Howard worked from 6:25 a.m. to 4:57 p.m. The only consolidation clerk on duty at 10:17 p.m. was DiStasio, who worked from 8:22 p.m. to 11:49 p.m.

22. I was able to determine the actual work hours for the window clerks and the consolidation clerks by reviewing Postal business records. All window clerks and consolidation clerks were required to use a time card to record the beginning and end of their shift each day. The Postal Service maintains copies of these official time records.

23. During my interview with Clerk Howard, she showed me an IRT generated tape (Exhibit 17) from May 4, 2001, which showed that she had counted $3,100 in $100 bills, $450 in $50 bills, $560 in $20 bills and $1,960 in $10 bills, for a total of $6,070 in cash. Howard stated that upon noticing the discrepancy on May 6, 2001, she telephoned Consolidation Clerk Irene McClanahan, who confirmed that she had counted $6,070 in cash on May 4, 2001. Clerk Howard explained that for someone to make changes to her financial reports and reprint them, they would have to know her IRT password. Clerk Howard explained to me that she believed DiStasio was the only other person who knew her password. She explained that a long time ago DiStasio telephoned her at her home and told her that he needed her IRT password to make a minor correction to her Daily Financial Report. Howard said that

15

she in fact told DiStasio her IRT password. Howard stated that she is certain that DiStasio knows her password because he has made comments to her that her password is just one digit different from his password. Howard said her password is "1552" and DiStasio told her his password is "1662". Clerk Howard has told me that she has not disclosed her IRT password to anyone other than DiStasio, and has not changed it since communicating it to DiStasio.

24. I interviewed Consolidation Clerk Irene McClanahan on May 21, 2001. In explaining the procedures in place at Fort Point Station in January through May 2001, McClanahan said that when she was unable to consolidate a window clerk's Daily Financial Report due to time constraints, the window clerk would place his/her paperwork and remittance in a sealed envelope and put it in the registered mail cabinet for DiStasio to retrieve and consolidate later in the day. McClanahan stated that on May 4, 2001 she did not consolidate Clerk Howard's Daily Financial Report. McClanahan stated that Clerk Howard was running late that day and McClanahan was therefore not able to consolidate her Daily Financial Report and remittance. McClanahan specifically recalls that although she did not have time to consolidate Howard's paperwork, she counted the cash portion of Clerk Howard's remittance and verified it to the amount on Howard's Daily Financial Report. McClanahan said she distinctly remembered counting $6,070 in cash and verifying the amount to the entry on Howard's Daily Financial Report.

McClanahan stated that it was her normal practice to place her initials next to the entry relating to a cash remittance if in fact the numbers were accurate. She cannot remember for certain, though, whether she initialized Clerk Howard's report on May 4. When shown Clerk Howard's Daily Report dated May 4, 2001, printed at 10:17:23, McClanahan stated that she did not place the initials "IM" next to the cash remittance amount of $5,070. She stated that she wrote her initials differently from the way the initials appeared on the report. Irene McClanahan also stated that she had not seen DiStasio since he returned to work in January 2001 after being out for a period of time, but had spoken to him over the telephone since his return to work. McClanahan stated that she recalled a telephone conversation with DiStasio during which he offered to consolidate some of the earlier window clerks' reports. According to McClanahan, DiStasio specifically asked her to leave Clerk Howard's reports for him to consolidate. McClanahan added that she had never asked a window clerk for his/her password and does not know the password of any clerk.

25. I interviewed Consolidation Clerk DiStasio on May 21, 2001. DiStasio told me that on May 4, 2001, he retrieved Clerk Howard's financial reports and remittance from the registered mail cabinet. He said Clerk Howard's financial reports and remittance were in a Priority Mail envelope, which was inside another envelope. He said that the envelopes were properly sealed when he took them from

17

the safe. DiStasio described Clerk Howard's Daily Report and remittance of May 4, 2001 as being packaged the same way Clerk Howard described it to me. DiStasio said that inside the envelopes was a full set of financial reports for Clerk Howard, except there was no listing of the money orders she had issued that day. DiStasio told me that he used Clerk Howard's IRT disk to print another set of reports so that he could obtain a money order listing for her. (As stated previously, the consolidation clerks were allowed to print reports from a window clerk's IRT disk without "re-opening" the disk, however, the disk had to be "re-opened" in order to make any changes). However, no money order listing printed out. DiStasio said he threw away all the reports he had printed and used Clerk Howard's original reports obtained from the envelope he retrieved from the cabinet. DiStasio was shown Clerk Howard's Daily Financial Report dated May 4, 2001, at 10:17:23 p.m. He identified it as being the one that was included with Clerk Howard's remittance. DiStasio first denied writing the initials "IM" near the cash remitted amount of $5,070 on Clerk Howard's Daily Financial Report dated May 4, 2001, 10:17:23 pm. When I asked if he had told Supervisor Julie Lynch that he did, in fact, write the initials "IM," DiStasio then said that he actually did write the initials near $5,070. DiStasio said he wrote "IM" because Consolidation Clerk Irene McClanahan would have been the person who verified the cash remitted by Clerk Howard on May 4, 2001. DiStasio said there was only

18

$5,070 in the envelope when he opened it. DiStasio told me he did not re-open Clerk Howard's IRT disk nor did he make any changes to her financial reports. He said that the Daily Financial Report dated May 4, 2001 with a time of 10:17:23 p.m. was the same one he had taken out of the sealed envelope. DiStasio stated that he did not know Clerk Howard's IRT password. He denied telling Clerk Howard that he knew her password and that it was one digit different from his. DiStasio was asked how Clerk Howard's Daily Financial Report could have had a time of 10:17 p.m. when she left work at about 5 p.m. He said that it is possible that someone took Clerk Howard's Daily Financial Report and remittance out of the registered mail cabinet, changed the internal clock in the IRT, re-opened Clerk Howard's disk using the control disk and her password, made changes to Clerk Howard's Daily Financial Report, taken $1,000 in cash, then replaced Clerk Howard's Daily Financial Report with the newly printed Daily Financial Report. DiStasio said that the person would have had to change the IRT's internal clock back to the proper time when they were done. When asked if the sealed envelope containing Clerk Howard's remittance and paperwork on May 4, 2001 appeared to have been tampered with, he said that it did not. DiStasio was shown the five other reports (see list at Exhibit 1 for dates) which had been altered between January and May 2001. Each of these reports (see discussion below) were printed with times between 8:39 p.m. and 9:31 p.m. DiStasio denied any

19

knowledge of the adjustment entries made to these reports. He stated that he did not make any of the adjustments nor did he take any funds resulting from those adjustments.

26.  I reviewed all window clerk Daily Financial Reports on file at Fort Point Station from January 1, 1999 through January 15, 2001.  The Daily Financial Reports were reviewed for instances of adjustments that were consistent with those six instances from January 16 to May 4, 2001 in which Clerk Howard's Daily Financial Reports were altered after her work hours.  During the review I found an additional 43 instances between February 1, 1999 and December 13, 1999 in which adjustments were made to Clerks Howard and Clerk Halley' Daily Financial Reports.  In every instance but two (as noted in paragraph 5), the adjustments had been made after their normal work hours.  A total of $22,440 in reported postage sales, with a corresponding reduction in remittance, had been deducted from Clerk Howard and Clerk Halley's Daily Financial Reports after they were submitted.

27.  During the review of window clerks' Daily Financial Reports, I found no instances of unauthorized adjustments between December 14, 1999 and January 26, 2001.  DiStasio was out of work from January 2000 to January 16, 2001, due to an injury.  I found no instances of unauthorized adjustments during the time of DiStasio's absence of more than a year.

28.  A review of the registered mail logs confirmed that in each of the six instances of unauthorized adjustments to

20

Clerk Howard's Daily Financial Reports between January 26 and May 4, 2001, DiStasio was the individual who consolidated her reports.

29. During the interview with DiStasio on May 21, 2001, he stated that someone could have taken Clerk Howard's paperwork and remittance from the cabinet, made the changes to her reported postage sales, removed the extra funds and then returned the altered Daily Financial Report and remittance to the registered mail cabinet. DiStasio maintained that someone altered Clerk Howard's Daily Financial Report prior to him retrieving them from the registered mail cabinet. Before DiStasio's injury in January 2000, his normal work hours were 4 p.m. to 12:30 a.m. During this time, DiStasio would be at work prior to Clerk Howard leaving for the day. This is reflected in DiStasio's and Clerk Howard's time records. DiStasio was working as the consolidation clerk and was present when Clerk Howard counted her funds and completed her paperwork on many of the days on which unauthorized adjustments occurred prior to January 2000. On these occasions, Clerk Howard would have handed her Daily Financial Report and remittance directly to DiStasio, thereby eliminating the possibility that they were altered by someone other than DiStasio.

30. I reviewed attendance records for all window clerks who worked at Fort Point Station from January 1999 to May 2001. I reviewed the attendance records to determine if any

one employee was present on each of the 49 days that unauthorized adjustments were made to Clerk Howard and Clerk Halley's Daily Financial Report. I determined that DiStasio was the only clerk assigned to Fort Point Station who was present on each of the days that adjustments occurred.

31. I interviewed Clerk Halley on July 17, 2001. She told me that she received a telephone call from DiStasio several years ago. She said she had worked earlier that day and was home when DiStasio telephoned her. Halley said that DiStasio told her there were mistakes on her Daily Financial Report that prevented him from consolidating her financial reports. He suggested she either return to the post office and make the necessary corrections or tell him her password so he could make the corrections for her. Clerk Halley said she told DiStasio her IRT password so he could make the corrections to her Daily Financial Report. Clerk Halley said that the next time she reported to work she changed her IRT password. Halley told me she had two IRT passwords she would use, alternating periodically between the two of them. She said that although she changed the password as soon as possible after giving it to DiStasio, she would have changed it back to the one known by DiStasio at a later date. Halley was shown copies of the reports which had adjustments reducing her reported postage sales after she had clocked out for the day. Halley told me that under no circumstances would she return to work after leaving in order to make an adjustment or to print another report. Clerk Halley told me

22

that she had not given anyone else the IRT password she to provided DiStasio during their telephone conversation.

**EXAMPLES**

April 6, 2001

32. Clerk Howard left work at 4:57 p.m. DiStasio worked from 8:02 p.m. to 11:57 p.m. The Daily Financial Report on file for Clerk Howard (Exhibit 2, titled Final PS-1412) was printed at 8:55:55 (hour, minutes, seconds). The corresponding Clerk Adjustment List (Exhibit 3) was automatically printed along with the Daily Financial Report, listing a print time seven seconds later, at 8:56:02. The list indicates that Clerk Howard made a handful of minor reductions during her work hours, at 1:26 p.m., 4:21 p.m., and 4:45 p.m. Then, at 8:55, long after Clerk Howard had departed work and the exact time that her Daily Financial Report was printed, a reduction of $800 was made to her report. Also, next to the cash remittance figure on the report, there appears to be illegible initials handwritten in. This writing appears to be consistent with an attempt to validate the amount remitted. The registered mail log (Exhibit 4, line 31) confirms that Clerk Howard left her report to be consolidated by DiStasio. The number in the left-hand column represents the registered mail number attached to the envelope. The next column lists the numbers 1412 and 54. 1412 indicates that the envelope contained a PS Form 1412, Daily Financial Report, with corresponding paperwork and remittance. The number 54 identifies the

23

clerk. Clerk Howard was assigned number 54. In the last column are the initials of the person who retrieved the items. The initials are those of Romeo DiStasio. Finally, Exhibit 5 is a copy of DiStasio's log where he added up the remittance of all the clerk's whose reports he consolidated.

April 13, 2001

33. Clerk Howard left work at 4:30 p.m. DiStasio worked from 8:22 p.m. to 12:10 a.m. The Daily Financial Report on file for Clerk Howard (Exhibit 6), was printed at 8:39:28 p.m. The corresponding Clerk Adjustment List (Exhibit 7) was automatically printed along with the Daily Financial Report, listing a print time six seconds later, at 8:39:34. The list indicates that Clerk Howard made a handful of reductions during her work hours, at 11:23 a.m., 11:25 a.m., and 11:30 a.m. Then, at 8:39 p.m., long after Clerk Howard had departed work and the exact time that her Daily Financial Report was printed, a reduction of $600 was made to her report. And again, next to the cash remittance figure on the report there appears to be illegible initials handwritten in, consistent with an attempt to validate the amount remitted. The registered mail log (Exhibit 8) again confirms that DiStasio retrieved Clerk Howard's paperwork and remittance. In reviewing DiStasio's remittance log (Exhibit 9), I noted that all of the figures he wrote down were legible, with the exception of Clerk Howard's cash remittance figure, which is scribbled and is illegible.

April 20, 2001

34. Clerk Howard left work at 4:33 p.m. DiStasio worked from 8:35 p.m. to 12:30 a.m. The Daily Financial Report on file for Clerk Howard (Exhibit 10) was printed at 9:31:32 p.m. The corresponding Clerk Adjustment List (Exhibit 11) was automatically printed along with the Daily Financial Report, listing a print time six seconds later, at 9:31:38. The list indicates that at 9:31 p.m., long after Clerk Howard had departed work and the exact time that her Daily Financial Report was printed, a reduction of $1,000 was made to her report. And again, next to the cash remittance figure on the report there appears to be initials (illegible) handwritten in, consistent with an attempt to validate the amount remitted. The registered mail log (Exhibit 13) again confirms that DiStasio retrieved Clerk Howard's paperwork and remittance. In retrieving these documents from a storage box, I also found an IRT generated tape (Exhibit 12) which Clerk Howard used to add up her numbers for the day. The tape was printed at 3:50:55 p.m. and shows that Howard added up $5,930 in cash remittance. Yet, in reviewing DiStasio's remittance log Exhibit 14), I noted that he only attributed $4,930 to Howard, consistent with the $1,000 reduction made at 9:31 p.m.

<u>May 4, 2001</u>

35. Attached as exhibits 15 through 21 are the corresponding documents pertaining to May 4, 2001, the one date for which Clerk Howard kept a copy of her Daily Financial Report. As discussed above, Howard's original

25

report (Exhibit 15) lists a print time of 4:40:04 p.m. with a cash remittance of $6,070. The report on file (Exhibit 18) lists a print time of 10:17:23 p.m. with a cash remittance of $5,070. The report also contains the handwritten initials which DiStasio acknowledged he wrote. The Clerk Adjustment List on file (Exhibit 19) was printed at 10:17:30 p.m. and list a $1,000 reduction that was made at 10:17 p.m. Howard's original list, which was submitted to DiStasio (Exhibit 16), was printed at 4:40:12 p.m. and does not contain the $1,000 reduction. Also attached is the IRT generated tape (Exhibit 17) which Howard used to add her numbers, which confirms that she counted $6,070 in cash remittance. The registered mail log (exhibit 19) confirms that DiStasio consolidated Howard's report (DiStasio also admitted the same). DiStasio's remittance log (Exhibit 21) shows that DiStasio only added $5,070 of Howard's $6,070 to his total cash remittance. Finally, Howard's original report lists her final stamp accountability total (see Stamp Accountability at right side of Exhibit 15) as $138,502.48. The copy on file list her total as $139,502.47 (see right side of exhibit 18). This is the discrepancy that Howard noticed on May 6, 2001, which first brought this scheme to light.

36. Based on the foregoing facts, there is probable cause to believe that Romeo F. DiStasio while employed by the U. S. Postal Service did fail to account for money or property coming into his hands or under his control, in the

26

execution of, or under color of his employment, in a manner not authorized by law, in violation of Title 18, United States Code, Section 1711.

                                        _____
                                        Michael J. Gendron
                                        Postal Inspector
                                        U.S. Postal Inspection Service


Sworn and subscribed to before me this sixth day of April, 2004.

                                        _____
                                        JUDITH G. DEIN
                                        UNITED STATES MAGISTRATE JUDGE